**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MPW INDUSTRIAL SERVICES, INC., | : | |
| | : | **Case No. 2:02-CV-955** |
| **Plaintiff,** | : | **Judge Holschuh** |
| **v.** | : | |
| POLLUTION CONTROL SYSTEMS, INC., | : | **Magistrate Judge Abel** |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION & ORDER

Plaintiff, MPW Industrial Services, Inc. ("MPW"), filed suit against Pollution Control Systems, Inc. ("PCS"), seeking to recover $295,257.62 for services rendered.  MPW seeks recovery under alternative theories of breach of contract, breach of implied contract, promissory estoppel, unjust enrichment, quantum meruit, and account stated. PCS filed counterclaims of tortious interference with contractual relations, unjust enrichment, fraud, and conversion of trade secrets. This Court's jurisdiction is based on diversity of citizenship.

This matter is currently before the Court on Plaintiff's motion for summary judgment. (Record at 59).  For the reasons set forth below, the Court grants Plaintiff's motion with respect to the breach of contract/breach of implied contract claim, and the counterclaims of unjust enrichment, fraud, and conversion of trade secrets.  However, the Court concludes that genuine issues of material fact preclude summary judgment on the tortious interference claim.

## I.    Background and Procedural History

This case involves a dispute between a contractor, a sub-contractor, and an employee who left one to work for the other, taking a major client with him.  The contractor, PCS, was a

Pennsylvania corporation that designed and installed air pollution control equipment for industrial and manufacturing clients.  Mark Joseph, President of PCS, hired Mark Geraghty in March of 2000 with the intent of expanding the business to include a service component. Geraghty had the technical knowledge and experience PCS needed to begin servicing the air pollution control equipment it sold. (Joseph Dep. at 23, 75, 84).  At the beginning of the employment relationship, PCS required Geraghty to sign a confidentiality and non-competition agreement.[1]

Joseph had met Geraghty when Geraghty was a sales representative for FIMCO, an industrial cleaning service provider.  (Joseph Dep. at 72-75).  Shortly after Geraghty began working at PCS, he helped PCS again expand its offerings to include industrial cleaning services. PCS, however, did not provide those services directly.  Instead, it hired low-cost sub-contractors to do the work, and billed the clients at a higher rate so that PCS would earn a profit on each job.

Geraghty introduced Plaintiff MPW, an Ohio corporation, to PCS as one of those sub-contractors.  (Id. at 71, 100).  PCS began using MPW's services in August of 2000, and eventually came to rely exclusively on MPW as the sub-contractor for all of its industrial cleaning needs.  (Id. at 114-15).  On two occasions, Joseph met with MPW officials to discuss the relationship between the two companies.  Joseph testified that based on representations made by MPW, he believed that PCS and MPW had a partnership.  Joseph admits, however, that there

---

[1]  The agreement prohibited Geraghty, during his employment and two subsequent years, from divulging information relating to PCS's business, including client names, addresses, or specific needs, as well as business plans, processes or data, from competing with PCS within the boundaries of PCS's territory, and from enticing other PCS employees to leave. (Ex. 12 to Joseph Dep. at ¶¶ 5-6).

was no written agreement defining the nature of the relationship between the companies.  (Id. at
115, 119-20, 129, 133).

Over the course of two years, MPW provided industrial cleaning services for many of
PCS's customers, including Duferco Steel, a client Geraghty brought with him from FIMCO.
From late 2001 into 2002, PCS began losing business.  Joseph stated in his deposition that PCS
was "in financial distress" and in a "desperate situation." (Id. at 160, 208). Employees were laid
off and at least one was fired. Joseph told his employees, including Geraghty, that they would
have to justify their continued employment on a weekly basis. (Id. at 209-10, 233).

With the future of PCS uncertain, Geraghty decided to resign.  On September 2, 2002,
Geraghty began working for MPW as a sales representative.  Shortly after that, another PCS
employee, Erin Hutchinson, also resigned and went to work at MPW.  On September 9, 2002,
PCS informed MPW that, because MPW had hired Geraghty, PCS was cancelling payment on a
check for $34,000 and it would not be making any future payments for services previously
rendered. (Ex. 5 to Joseph Dep.).

On September 11, 2002, MPW asked PCS to reissue the cancelled check, and to provide
reasonable and adequate assurance that it would pay for all other services previously rendered.
PCS did not respond.  On September 26, 2002, MPW filed suit against PCS seeking to recover
$295,257.62, plus interest, for services previously rendered to PCS's clients.  MPW asserts
alternative theories of breach of contract, breach of implied contract, promissory estoppel, unjust
enrichment, quantum meruit, and account stated.

Shortly after Geraghty began working at MPW, PCS contacted Duferco Steel concerning
an open purchase order that was expected to bring in approximately $196,000 over the course of

one year.  Duferco told PCS that the contract had been cancelled.  (Joseph Dep. at 294, 298).

Because Geraghty and Hutchinson had left, and the Duferco account had been terminated, PCS

made the decision to abandon the industrial cleaning services portion of its business.  Joseph

testified that he believed Geraghty's departure was "the death nail to the organization."  (Id. at

160).  PCS eventually ceased all operations and, early in 2003, sold its remaining assets to

Environmental Safety Solutions. (Id. at 33, 283-84).

On February 14, 2003, PCS filed counterclaims against MPW for tortious interference

with contractual relations, unjust enrichment, fraud, and conversion of trade secrets.  PCS also

filed a third party complaint against Geraghty, alleging intentional interference with contract,

breach of contract, breach of the duty of loyalty, and fraud, and seeking enforcement of the non-

compete agreement.  In November of 2004, however, PCS dismissed all claims against Geraghty

after he filed for bankruptcy.  On May 31, 2005, Plaintiff MPW moved for summary judgment

with respect to all remaining claims and counterclaims.

## II.    Standard for Granting Summary Judgment

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a

matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains

for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).  The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).  A

5

"material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court

may, however, enter summary judgment if it concludes that a fair-minded jury could not return a

verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at

251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

## III.    Discussion

### A.    MPW's Claims Against PCS

MPW seeks to recover $295,257.62, plus interest, for industrial cleaning services it

provided as a sub-contractor for PCS.  MPW seeks recovery under a variety of legal and

equitable theories including breach of contract, breach of implied contract, promissory estoppel,

unjust enrichment, account stated, and quantum meruit.  MPW contends that, under any of these

theories, summary judgment is appropriate because it is undisputed that PCS owes MPW for

services rendered to PCS's clients.

PCS, on the other hand, urges the Court to deny summary judgment because: (1) fraud

and misrepresentation justify rescission of the contract between MPW and PCS; (2) with respect

to at least one coating job, there are questions about whether the amount billed by MPW is

justified; (3) PCS is entitled to set-offs and recoupment on its counterclaims; and (4) MPW

cannot bring equitable claims of unjust enrichment, quantum meruit, or promissory estoppel

since it acted with unclean hands.

After carefully reviewing the evidence presented, the Court concludes that MPW is

entitled to summary judgment on its breach of contract/breach of implied contract claim.  As

discussed below, PCS has no basis for rescinding the contract, and no genuine issue of material

fact remains with respect to either liability or damages.  Moreover, the fact that PCS may be

entitled to a set-off on one or more of its counterclaims does not prevent the Court from granting summary judgment in favor of MPW on the breach of contract/breach of implied contract claim. Finally, because the Court finds that MPW is entitled to summary judgment on this claim, the Court need not address PCS's argument concerning the equitable claims.

In order to recover for breach of contract, MPW must show: (1) the existence of a binding contract between MPW and PCS; (2) performance by MPW; (3) breach by PCS; and (4) damage to MPW as a result of the breach. See Samadder v. DMF of Ohio, Inc., 154 Ohio App. 3d 770, 778, 798 N.E.2d 1141, 1147 (Ohio Ct. App. 2003); Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)(defining elements of a breach of contract claim as the existence of a contract, a breach of a duty imposed by the contract, and resultant damages).[2]

In this case, there is no express written agreement setting forth the rights and responsibilities of PCS and MPW as contractor and subcontractor. Nevertheless, a binding agreement, and mutual promises, can clearly be implied from the course of dealings between the parties. As the court noted in Cuyahoga County Hospitals v. Price, 64 Ohio App. 3d 410, 416, 581 N.E.2d 1125, 1128 (Ohio Ct. App. 1989), "[a]n implied contract may be proved by showing that the circumstances surrounding the parties' transactions make it reasonably certain that an agreement was intended." See also AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001)("A contract implied in fact is an actual contract arising when there is an agreement, but the parties' intentions are inferred from their conduct in light of the circumstances."). In this case, PCS and MPW had an ongoing contractor/subcontractor

_____

[2] Because the elements of breach of contract are similar in Ohio and Pennsylvania, the Court need not decide which State's law applies.

8

relationship. For two years, MPW, at the request of PCS, had provided industrial cleaning services for PCS's customers. For each job, MPW had submitted an invoice to PCS, and PCS had paid MPW for the work performed. Under these circumstances, no reasonable jury could find that the parties were not bound by an implied contract whereby PCS was obligated to pay MPW for services rendered on its behalf.

Furthermore, based on the evidence presented, no reasonable jury could find that MPW failed to perform the services at issue. In support of its motion, MPW has submitted the affidavit of James Mock, former Vice President and General Manager of MPW's Industrial Cleaning Group. Attached to Mock's affidavit are copies of the invoices MPW sent to PCS requesting $295,257.62 in payment for services rendered to PCS's clients. Mock states that although MPW performed the work described in each of those invoices, PCS has failed to pay MPW for that work. (Mock Aff. ¶¶ 3-5; Ex. C to Mot. Summ. J.). PCS does not deny that MPW actually performed the work at issue, or that PCS breached the contract by refusing to pay for that work. (Joseph Dep. at 172).

The only real question raised by PCS concerning liability for breach of contract is whether it had a legal excuse to breach the contract. In its memorandum in opposition, PCS argues that fraud and misrepresentation justify rescission of the contract. PCS contends that MPW misrepresented its intentions, and "fraudulently and deceitfully" entered into a contract with PCS "with the ulterior and sinister motive of robbing PCS of its sales personnel and its customer base." (Mem. in Opp'n at 19).

Rescission of a contract may be warranted if the contract is fraudulently induced. Under Ohio or Pennsylvania law, PCS may establish the defense of fraudulent inducement by

demonstrating:

> (1) a representation or, where there is a duty to disclose,
> concealment of a fact, (2) which is material to the
> transaction at hand, (3) made falsely, with knowledge of its
> falsity, or with such utter disregard as to whether it is true
> or false that knowledge may be inferred, (4) with the intent
> of misleading another into relying upon it, (5) justifiable
> reliance on the representation or concealment, and (6) a
> resulting injury proximately caused by that reliance.

Gentile v. Ristas, 160 Ohio App. 3d 765, 781, 828 N.E.2d 1021, 1033-34 (Ohio Ct. App. 2005).

See also Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa.

Super. Ct. 2005).  Based on the evidence presented, no reasonable jury could find that MPW

fraudulently induced PCS to enter into a contract.

The first required element is "a representation or, where there is a duty to disclose,

concealment of a fact."  Although PCS contends that "MPW misrepresented its intentions for

operating as a subcontractor for PCS," PCS has failed to identify any statement allegedly made

by MPW to induce PCS to hire MPW as a sub-contractor.  Furthermore, PCS has not identified

any basis for imposing on MPW a duty to disclose a fact that might have been concealed.

Silence constitutes a misrepresentation only in situations where the law recognizes a duty to

speak.  See Schulman v. Wolske & Blue Co., L.P.A., 125 Ohio App. 3d 365, 372, 708 N.E.2d

753, 758 (Ohio Ct. App. 1998).  Mark Joseph testified at his deposition that he believed that PCS

had a "partnership" with MPW.  (Joseph Dep. at 115, 133).  PCS contends that this partnership

gave rise to a fiduciary duty.  However, PCS has presented no evidence to support Joseph's

subjective belief.  He admits that there was no written partnership agreement.  (Id. at 133).

While PCS may have come to rely on MPW for all of its industrial cleaning needs, there is no

evidence that their relationship was ever anything other than a contractor/subcontractor

relationship. Because PCS has failed to identify either a representation made by MPW, or a basis for imposing a duty to disclose a particular fact, no reasonable jury could find that rescission of the contract is justified.

For the reasons set forth above, the Court finds no genuine issue of material fact with respect to PCS's liability on MPW's breach of contract/breach of implied contract claim. Nor is there a genuine issue of material fact concerning the extent of PCS's liability. James Mock has presented an affidavit, with attached invoices totaling $295,257.62. He states that MPW performed the work described in the invoices, and submitted those invoices to PCS according to agreed upon prices and fees, which were fair and reasonable. (Mock Aff. ¶¶ 3-5).

PCS raises no serious objections to the amount allegedly owed. Joseph simply testified that only Geraghty and Hutchinson were qualified to verify that the amounts charged were justified. (Joseph Dep. at 145-46). At his deposition, Joseph did raise a concern about a billing discrepancy with respect to a coating job MPW performed for one of PCS's clients. According to Joseph, although the scope of services MPW provided to that client was reduced, the price MPW charged PCS did not change. However, Joseph could not remember the name of the client or the date this occurred, and could not identify the specific invoice. (Id. at 163-64). Absent any evidence that this coating job is included among the invoices which are the subject of this lawsuit, the Court finds Joseph's testimony largely irrelevant to a determination of damages.

Finding no genuine issue of material fact concerning either liability or damages on the breach of contract/breach of implied contract claim, the Court grants summary judgment in favor of MPW in the amount of $295,257.62, plus interest. As PCS correctly notes, however, this amount may be subject to set-off if PCS prevails on any of its counterclaims.

11

**B.     PCS's Counterclaims Against MPW**

MPW also seeks summary judgment in its favor on the four counterclaims filed against MPW by PCS: (1) tortious interference with contractual relationships; (2) unjust enrichment; (3) fraud; and (4) conversion of trade secrets.  PCS argues that genuine issues of material fact preclude summary judgment on each counterclaim.

**1.     Tortious Interference with Contractual Relations**

PCS alleges that during the relevant time period, it "was engaged in several current and prospective contracts with third parties," and that MPW tortiously interfered with these contractual relations "by inducing Mark Geraghty, a former PCS employee, to not only entice away PCS customers but also acquire business for MPW."  PCS further alleges that MPW had no privilege or justification for interfering with those relationships.  (Countercl. ¶¶ 1-3).  Although the counterclaim alleges interference with "several" contracts with third parties, PCS has not identified any third party contacted by MPW other than Duferco Steel.  Joseph testified at his deposition that while he believed that MPW contacted other clients, he could not identify any of them.  (Joseph Dep. at 280, 292).  Understandably then, the parties have focused this claim entirely on MPW's alleged interference with PCS's relationship with Duferco Steel.

In order to recover on a claim for tortious interference with a contract under Ohio law, PCS must prove: (a) the existence of a contract; (b) MPW's knowledge of that contract; (c) MPW's intentional procurement of the contract's breach; (d) lack of justification; and (e) resulting damages.  See Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 419, 650 N.E.2d 863, 866 (Ohio 1995).  The same is true under Pennsylvania law.  See Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003)("The elements of a cause of action for

intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.").  In the Court's view, based on the evidence presented and construing it in a light most favorable to PCS, a reasonable jury could find that MPW tortiously interfered with PCS's contractual relationship with Duferco Steel.

MPW first argues that no contract existed between PCS and Duferco Steel.  It is true that PCS has not produced any written contract.  Moreover, Joseph admitted that he could not recall ever seeing such a contract.  (Joseph Dep. at 295).  Joseph testified at his deposition, however, that it was his understanding that there was some kind of an agreement, either a contract or a blanket purchase order, by which Duferco had agreed to pay PCS between $190,000 and $200,000 for certain industrial cleaning services over the course of twelve months.  (Id. at 294-96).  Joseph's testimony is corroborated by Geraghty, who testified that when he began working for MPW, he "knew that Duferco had a contract with PCS."  (Geraghty Dep. at 13).  Based on the testimony of Joseph and Geraghty, a reasonable jury could find that Duferco Steel did have a contract with PCS.

With regard to the second element, it is undisputed that MPW knew of the contract between PCS and Duferco.  James Mock, a Vice President at MPW, testified at his deposition that he was aware of that contract.  (Mock Dep. at 28-29).  His knowledge, as an officer of the corporation, is imputed to MPW.  See Arcanum Nat'l Bank v. Hessler, 69 Ohio St. 2d 549, 557,

13

433 N.E.2d 204, 211 (Ohio 1982).

MPW next argues that it did not purposely interfere with an existing contractual relationship between PCS and Duferco Steel.  MPW contends that, at the time it accepted Duferco's business, PCS had already decided to abandon the industrial cleaning business and could not have fulfilled its contractual obligations to Duferco anyway.  Again, there are genuine factual disputes concerning the circumstances surrounding the end of Duferco's relationship with PCS.  It is not clear why or when Duferco terminated that relationship, or whether MPW induced Duferco to do so.  Mock testified that it was his understanding that Duferco's contract with PCS had "expired" and that Duferco was looking for alternate vendors.  (Mock Dep. at 28-29).  Joseph, however, testified that Duferco cancelled the purchase order shortly after Geraghty left, even though the purchase order had not been completed.  (Joseph Dep. at 298).  In any event, viewing the evidence in a light most favorable to PCS, a reasonable jury could find that MPW did intentionally procure the contract's breach.

PCS must next establish that there was a lack of justification for the procurement of the breach.  As Ohio courts have held, "[o]nly improper interference with a contract is actionable."  Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858 (Ohio 1999).  Ohio and Pennsylvania courts have both adopted Section 767 of the Restatement (2d) of Torts, listing the following factors to be considered in determining whether interference with a contract is improper:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations

14

between the parties.

See Fred Siegel, 85 Ohio St. 3d at 178-79, 707 N.E.2d at 860; Yeager's Fuel, Inc. v.

Pennsylvania Power & Light Co., 953 F. Supp. 617, 667 (E.D. Pa. 1997).

Viewing the evidence in a light most favorable to PCS, the Court concludes that a

reasonable jury assessing these factors could find that MPW's conduct was improper. Duferco

Steel was one of PCS's most lucrative account and, according to PCS, there was an open blanket

purchase order worth over $190,000. Furthermore, MPW was aware that Duferco likely fell

within the scope of the non-compete agreement Geraghty had with PCS.[3] Although it knew of

both of these contracts, MPW nevertheless solicited Duferco's business. MPW argues that PCS

could not have fulfilled its contractual obligations to Duferco anyway since PCS had decided to

abandon its industrial cleaning business. However, Joseph's deposition testimony indicates that

it was only after PCS learned that Duferco had canceled the purchase order that PCS decided to

abandon its industrial cleaning business. (Joseph Dep. at 285-86). While not all interference by

competitors is actionable, a reasonable jury could find that, under the circumstances presented

here, MPW's solicitation of Duferco's business was improper. Furthermore, assuming that

MPW induced Duferco to cancel the open purchase order worth over $190,000, it would be

beyond dispute that MPW's interference with that contract resulted in damages to PCS.

In summary, MPW has failed to establish that it is entitled to summary judgment on the

tortious interference counterclaim. Because genuine issues of material fact remain, the Court

---

[3] The Court notes that both parties have extensively briefed the issue of whether the non-compete agreement that Mark Geraghty signed when he began his employment with PCS is enforceable. Because the viability of the tortious interference claim does not hinge on the enforceability of that agreement, the Court need not decide that issue at this juncture.

denies MPW's motion with respect to this counterclaim.

### 2. Unjust Enrichment

PCS also brings a counterclaim for unjust enrichment, alleging that "as a result of the actions and/or inactions of MPW they have been and continue to be unjustly enriched and have benefited to the detriment of [PCS]." (Countercl. ¶ 6). MPW is entitled to summary judgment on this claim. Under Ohio law, in order to establish a claim of unjust enrichment, PCS must prove that: (1) PCS conferred a benefit on MPW; (2) MPW knew of the benefit; and (3) MPW retained the benefit "under circumstances where it would be unjust to do so without payment." The Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 501-02 (6th Cir. 2003)(quotation omitted). The same elements are required under Pennsylvania law. See AmeriPro Search, 787 A.2d at 991. A claim of unjust enrichment is an equitable claim based on a quasi-contract theory. Id.

The "benefits" that PCS alleges it "conferred" on MPW were its industrial cleaning service business and Duferco, its largest client. No reasonable jury could find that PCS "conferred" these "benefits" on MPW. The word "confer" means "to bestow from or as if from a position of superiority" or "to give." Merriam-Webster OnLine, http://www.m-w.com/dictionary/confer (last visited March 2, 2006). This is not a situation where PCS voluntarily "bestowed" on MPW the industrial cleaning portion of its business, or "gave" MPW the Duferco account. To the contrary, PCS alleges that MPW stole Duferco as a client, contributing to the collapse of the industrial cleaning portion of PCS's business. While PCS's allegations might give rise to a tortious interference claim, they do not give rise to an unjust enrichment claim. Quite simply, there is no basis for imposing on MPW a duty to pay for benefits "conferred" by PCS. Finding no genuine issue of material fact, the Court concludes that MPW is entitled to

16

summary judgment in its favor on PCS's counterclaim of unjust enrichment.

### 3.    Fraud

PCS also brings a counterclaim of fraud, alleging that MPW "misrepresented their

intentions, business plans and reasons for conducting business with PCS."  (Countercl. ¶ 8).

Under either Ohio or Pennsylvania law, PCS must establish by clear and convincing evidence:

> (1) a representation or, where there is a duty to disclose,
> concealment of a fact, (2) which is material to the transaction at
> hand, (3) made falsely, with knowledge of its falsity, or with such
> utter disregard and recklessness as to whether it is true or false that
> knowledge may be inferred, (4) with the intent of misleading
> another into relying upon it, (5) justifiable reliance upon the
> representation or concealment, and (6) a resulting injury
> proximately caused by the reliance.

Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 540 (6th Cir. 2000); Youndt v. First

Nat'l Bank of Port Allegany, 868 A.2d 539, 545 (Pa. Super. 2005).  These elements are identical

to the elements required to prove fraudulent inducement of a contract.

As it did in response to the fraudulent inducement defense to the breach of contract

claim, MPW again argues that summary judgment is appropriate because PCS has not identified

any actual or implied misrepresentations that were made by MPW.  The Court agrees.  As

discussed above, PCS has never identified any specific representations that were made by MPW.

Nor has PCS identified any circumstances giving rise to a duty to disclose any particular fact.

Because no reasonable jury could find that PCS has satisfied the first element of the

counterclaim of fraud, the Court finds that MPW is entitled to summary judgment in its favor.

### 4.    Trade Secrets

Finally, PCS alleges that "MPW breached a fiduciary duty to PCS and converted trade

secrets and proprietary information of PCS for its own benefit and profit."  (Amd. Countercl. ¶

3).[4]  Specifically, PCS alleges that MPW converted PCS's sales technique and its customer lists.

MPW argues that summary judgment is appropriate because: (1) the sales technique used by

MPW is not a trade secret; and (2) while Joseph testified that he assumed that Geraghty had

misappropriated trade secrets, he admitted at his deposition that he had no evidence to support

that claim.  (Joseph Dep. at 281-82, 293).

In Ohio, a "trade secret" is defined as:

> . . . information, including the whole or any portion or phase of
> any scientific or technical information, design, process,
> procedure, formula, pattern, compilation, program, device,
> method, technique, or improvement, or any business
> information or plans, financial information, or listing of names,
> addresses, or telephone numbers, that satisfies both of the
> following:
>
> > (1) It derives independent economic value, actual or
> > potential, from not being generally known to, and not
> > being readily ascertainable by proper means by, other
> > persons who can obtain economic value from its
> > disclosure or use.
>
> > (2) It is the subject of efforts that are reasonable under
> > the circumstances to maintain its secrecy.

Ohio Revised Code § 1333.61(D).[5]  A sales technique that meets these requirements may

---

[4]  The Court has already concluded that there is no basis for finding that a fiduciary
relationship existed between PCS and MPW.

[5]  Likewise, Pennsylvania law defines a "trade secret" as:

> [i]nformation, including a formula, drawing, pattern, compilation
> including a customer list, program, device, method, technique or
> process that:
>
> > (1) Derives independent economic value, actual or
> > potential, from not being generally known to, and not being
> > readily ascertainable by proper means by, other persons

constitute a trade secret.  See Westco Group, Inc. v. City Mattress, No. 12619, 1985 WL 144712, at *2 (Ohio Ct. App. Aug. 15, 1991).  As the court noted in Westco, the question of whether a sales technique is a trade secret is a factual determination.  "In making that determination, the trial court should consider, among other things, the extent to which the information alleged to be secret is known to others in the same field and the ease of determining the information from other sources."  Id. (citing Water Mgmt., Inc. v. Stayanchi, 15 Ohio St. 3d 83 (1984)).

Based on the evidence presented, no reasonable jury could find that PCS's sales technique is protectible as a "trade secret."  Joseph testified at his deposition that the particular sales technique used by PCS was developed by the Sandler Sales Institute.  Joseph met Sandler and purchased his sales materials at a seminar open to the public.  (Joseph Dep. at 250-52).  Because information regarding the Sandler sales technique was "readily ascertainable by proper means" by anyone who sought it out, the Court concludes that the sales technique used by PCS is not protectible as a trade secret under either Ohio or Pennsylvania law.

A customer list may also be protectible as a trade secret.  See Ohio Revised Code § 1331.61(D); 12 Pa. C.S.A. § 5302.[6]  MPW does not deny that PCS's customer list might

_____

> who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S.A. § 5302.

[6] Pennsylvania courts, however, have held that customer lists "are at the very periphery of the law of unfair competition."  Renee Beauty Salons, Inc. v. Blose-Venable, 652 A.2d 1345, 1347 (Pa. Super. Ct. 1995).  "There is no legal incentive to protect the compilation of such lists 'because they are developed in the normal course of business anyway.'" Iron Age Corp. v. Dvorak, 880 A.2d 657, 663 (Pa. Super. Ct. 2005)(quotation omitted).

constitute a trade secret.  It argues only that there is no evidence that MPW misappropriated it.

MPW notes that when Joseph was asked at his deposition if he had any evidence that MPW had

employed or used any of PCS's trade secrets, Joseph responded that he had no knowledge.

(Joseph Dep. at 293).  In addition, when asked to identify the customers that MPW allegedly

contacted after Geraghty left, Joseph testified that he thought there were "at least a couple," but

he could not identify any customer other than Duferco.  (Joseph Dep. at 279-80).  In short, while

PCS alleges that MPW misappropriated its entire customer list, it has presented evidence that

MPW contacted just one customer, Duferco.

Moreover, under the circumstances presented here, it cannot be said that MPW

"misappropriated" Duferco's contact information.  "Misappropriation" is defined, under Ohio

law, as any of the following:

> (1) Acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means;
> (2) Disclosure or use of a trade secret of another without the
> express or implied consent of the other person by a person who did
> any of the following:
>> (a) Used improper means to acquire knowledge of the trade
>> secret;
>> (b) At the time of disclosure or use, knew or had reason to
>> know that the knowledge of the trade secret that the person
>> acquired was derived from or through a person who had
>> utilized improper means to acquire it, was acquired under
>> circumstances giving rise to a duty to maintain its secrecy
>> or limit its use, or was derived from or through a person
>> who owed a duty to the person seeking relief to maintain its
>> secrecy or limit its use;
>> (c) Before a material change of their position, knew or had
>> reason to know that it was a trade secret and that
>> knowledge of it had been acquired by accident or mistake.

Ohio Revised Code § 1333.61(B).  For purposes of the statute, "improper means" includes

"theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ohio Revised Code § 1333.61(A). Pennsylvania's definitions of "misappropriation" and "improper means" are substantially identical to Ohio's. See 12 Pa. C.S.A. § 5302.

There is no evidence to support a finding that MPW acquired Duferco's contact information through improper means. Any information that MPW had concerning Duferco was acquired either through Geraghty, or through what MPW legitimately learned about Duferco in MPW's capacity as a sub-contractor for PCS. Geraghty had access to Duferco's contact information prior to his employment with PCS because Duferco had been one of his clients at FIMCO. Furthermore, it cannot be said that any contact information that MPW obtained through its work as a sub-contractor for PCS was obtained by improper means, particularly in light of the fact that there was no confidentiality agreement between MPW and PCS. Based on the evidence presented, no reasonable jury could find that MPW misappropriated PCS's customer list. Finding no genuine issue of material fact, the Court grants summary judgment in favor of MPW on the conversion of trade secrets counterclaim.

## IV. Conclusion

For the reasons set forth above, the Court **GRANTS IN PART and DENIES IN PART** Plaintiff's motion for summary judgment. (Record at 59). Plaintiff is entitled to summary judgment in its favor on its claim of breach of contract/breach of implied contract in the amount of $ 295,257.62, plus interest. Plaintiff is also entitled to summary judgment in its favor on PCS's counterclaims of unjust enrichment, fraud, and conversion of trade secrets. However, genuine issues of material fact preclude summary judgment on the counterclaim of tortious

interference with a contractual relationship.

**IT IS SO ORDERED.**


Date: March 9, 2006                                    **/s/ John D. Holschuh**
                                                      John D. Holschuh, Judge
                                                      United States District Court